**COALITION TO PRESERVE HOUSTON and the Houston Independent School District, Plaintiff,**

v.

**INTERIM BOARD OF TRUSTEES OF the WESTHEIMER INDEPENDENT SCHOOL DISTRICT, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**WESTHEIMER INDEPENDENT SCHOOL DISTRICT, Defendant.**

Civ. A. Nos. H–77–92, H–77–121

United States District Court, S. D. Texas, Houston Division.

July 1, 1980.

---

William Pannill, Houston, Tex., for plaintiff Coalition.

Harvey Knudson, Atty. in Charge, J. Stanley Pottinger, Asst. Atty. Gen., Civil Rights Division, Dept. of Justice, Washington, D. C., and Mary L. Sinderson, Local Counsel, Asst. U. S. Atty., Houston, Tex., for United States.

James Ross, Houston, Tex., for defendant Interim Bd. of WISD.

Nathan Johnson, Asst. Atty. Gen., Austin, Tex., for defendant State of Texas and Texas Ed. Agency.

Before BROWN, Circuit Judge, and CARL O. BUE and O'CONOR, District Judges.

MEMORANDUM AND ORDER.

The Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1971 *et seq.,* ("the Act"), Section 5, prohibits a state or political subdivision from enacting or seeking to administer any voting qualification, prerequisite, standard, practice, or procedure different from that in effect on November 1, 1972 without first either instituting a declaratory judgment action in the United States District Court for the District of Columbia or obtaining approval from the Attorney General. 42 U.S.C. § 1973c. The voting change must not have the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority. *Id.*

The Interim Board of Trustees of the Westheimer Independent School District ("WISD") requested the Attorney General to preclear a WISD special election scheduled for January 15, 1977. On January 13, 1977 the Attorney General interposed an objection under the Act to the proposed election.

The Coalition to Preserve Houston and the Houston Independent School District ("the Coalition") filed suit on January 14, 1977 seeking declaratory and injunctive relief against the Interim Board of WISD. Judge Hannay denied the Coalition's request to convene a three-judge court and refused to issue a temporary restraining order. The election was held on January 15 and the WISD Board of Trustees was elected.

The United States of America filed suit on January 20, 1977 alleging that the WISD Board violated Section 5 of the Act, 42 U.S.C. § 1973c, and seeking declaratory and injunctive relief.

The Coalition appealed from Judge Hannay's order denying it relief, then sought dismissal of the appeal in order to renew its request for a three-judge court pursuant to 28 U.S.C. § 2284(a). The Coalition also sought consolidation of its case with the government's case. The Fifth Circuit dismissed the appeal without prejudice to the Coalition's right to request from the lower court the convening of a three-judge court. On July 1, 1977 Judge Hannay's order denying a three-judge court was vacated, the cases were consolidated, and Judge Noel requested a three-judge court.

On July 29, 1977 Chief Judge Brown consolidated the Westheimer cases with a series of pending cases in the Northern District of Texas in which the common issue was whether local school districts and municipalities in Texas are political subdivisions subject to Section 5 of the Act.

The three-judge court in the Northern District of Texas ruled in accordance with the decision in a related Supreme Court case, *United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978) and found that municipalities and school districts in Texas are "political subdivisions" as that term is defined in Section 14(c)(2) of the Act, 42 U.S.C. § 1973*l*(c)(2), and are therefore subject to the provisions of Section 5 of the Act.[1] *Hereford Independent School Dis-*

---

1. The *Sheffield* Court held that § 5 of the Act applies to the City of Sheffield, concluding that § 5 of the Act "covers all political units within designated jurisdictions . . . ," *United States v. Sheffield Bd. of Comm'rs,* 435 U.S. 110, 135, 98 S.Ct. 965, 981, 55 L.Ed.2d 148 (1978), and that Congress did not intend the substantive scope of § 5 to be limited by the definition in § 14(c)(2). *Id.* at 126, 98 S.Ct. at 976. Concerning § 14(c)(2), the Court observed that the definition of "political subdivision" in that section "was intended to operate only for purposes of determining which political units in nondesignated States may be separately designated for coverage under § 4(b)." *Id.* at 129, 98 S.Ct. at 978 (footnote omitted). The Court further commented that "once an area of a nonde-

signated State has been determined to be covered, all state actors within designated political subdivisions are subject to § 4(a)." *Id.* The State of Texas has been designated as a state covered by § 4(b) of the Act. 40 Fed.Reg. 43746 (September 23, 1975); *see also, Hereford Independent School Dist. v. Bell,* 454 F.Supp. 143, 144 (N.D.Tex.1978). Thus, this Court finds unnecessary any ruling that school districts in Texas are within the definition of "political subdivision" as that term is defined in § 14(c)(2) of the Act. This Court agrees with the Northern District of Texas Court that school districts in Texas are covered by § 5 of the Act, not because school districts come within the definition of "political subdivision" found in § 14(c)(2), but for the reason that

*trict v. Bell*, 454 F.Supp. 143, 144 (N.D.Tex. 1978). The court further held in its Memorandum and Order entered on June 2, 1978 that the school districts involved should be permanently enjoined from conducting elections under changed voting procedures until and unless these entities comply with Section 5 of the Act. *Id.* at 145.

By an order dated September 12, 1978 the three-judge court severed the Westheimer cases from those in the Northern District of Texas and remanded them to the Southern District for judgment to be entered in accordance with the decision in the consolidated case. Both of the Plaintiffs have filed Motions for Entry of Judgment and the Coalition has filed a Motion for Award of Attorneys' Fees.

■ The Plaintiffs point out that in the Memorandum and Order issued on June 2, 1978 the three-judge court held that school districts should be permanently enjoined from conducting elections under changed procedures until and unless Section 5 of the Act is complied with. The Plaintiffs request that the election held by WISD on January 15, 1977 be set aside and declared null and void for failure to comply with the preclearance requirements of the Act.

A request to have county elections set aside was declined by the Supreme Court of the United States in *Allen v. Board of Elections*, 393 U.S. 544, 571–72, 89 S.Ct. 817, 834–35, 22 L.Ed.2d 1 (1969), because Section 5 coverage was then an issue of first impression, the state enactments were not so clearly subject to the Section that a failure to submit them for approval constituted deliberate defiance of the Act, and the discriminatory purpose or effect of the statutes had not yet been determined by any court.[2] At the time of the election which is the subject of the present controversy, the Defendant apparently acknowledged the Section 5 coverage of the changed election procedures. This was evidenced by the Defendant's request to the Attorney General in a letter received on December 17, 1976, that he preclear the January 15, 1977 election (Stipulation ¶ 14). The discriminatory purpose or effect of the proposed voting changes accompanying the January 15 election was determined by the Attorney General, and he interposed an objection to the special election in a letter dated January 13, 1977 (Stipulation ¶ 15). The holding of the election by the Defendant despite the Attorney General's refusal to approve it was in deliberate defiance of the Act. Thus the instant case is readily distinguished from the circumstances of *Allen*.

The Supreme Court decided a Voting Rights Act case in 1971 in which the appellants sought to have certain elections set aside. *Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). The determination of an appropriate remedy was left for the District Court.[3] The Su-

---

Texas school districts are political units within a designated state. *See United States v. Sheffield Bd. of Comm'rs, supra.*

2. One way of viewing the language in *Allen* which defined the Court's reasons for not nullifying the election is that the *Allen* Court assumed the substantive determination of discriminatory purpose or effect must be made by a court. *Allen v. Board of Elections*, 393 U.S. 544, 571–72, 89 S.Ct. 817, 834–35, 22 L.Ed.2d 1 (1969). Subsequently, however, in the context of distinguishing "coverage" and "substantive" functions of the courts, the Supreme Court stated that Congress expressly had reserved consideration of the substantive determination to either the District Court for the District of Columbia or the Attorney General of the United States. *See Perkins v. Matthews*, 400 U.S. 379, 385, 91 S.Ct. 431, 435, 27 L.Ed.2d 476 (1971). *But see Matthews v. Leflore County*

*Bd. of Election Comm'rs*, 450 F.Supp. 765, 768 (N.D.Miss.1978), wherein the Court distinguished between the statutorily defined functions of the Attorney General and the District Court for the District of Columbia: "[the Attorney General] interposed an objection [to the state statute]; and no defendant . . . has instituted an action in the . . . District Court of the District of Columbia seeking a declaratory judgment that the changes . . . do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." *Id.* at 768.

3. *See Sumter County Democratic Executive Comm. v. Dearman*, 514 F.2d 1168, 1170 (5th Cir. 1975) (the Fifth Circuit Court of Appeals did not void the election and followed the Supreme Court's lead in *Perkins*, leaving the question of the appropriate remedy to the three-judge court).

preme Court, however, observed that some considerations in the determination might include the nature of the election-procedure changes complained of and whether it was reasonably clear at the time of the election that the changes were covered by Section 5. The Court further suggested that officials should be given an opportunity to seek approval of the changes and that a new election should be required only if they refused to do so or if approval is not forthcoming. *Id.* at 396–97, 91 S.Ct. at 440–441.

In 1978 the Supreme Court implemented the relief suggested in *Perkins* : affording local officials the opportunity to apply for federal approval of a voting change under Section 5 instead of ordering a new election. *Berry v. Doles*, 438 U.S. 190, 193, 98 S.Ct. 2692, 2694, 57 L.Ed.2d 693 (1978) (per curiam). Such remedy is clearly inapplicable to the present Defendant since it did attempt to have the voting change approved by the Attorney General before the election took place.

The fact that federal authorization of the election was denied rendered the holding of the election unlawful [4] and its legally unenforceable results shall be set aside. Preelection relief having been sought by the Coalition and improperly refused, the election now will be set aside. *See Hamer v. Campbell*, 358 F.2d 215, 222 (5th Cir.), *cert. denied*, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966).

Section 14(e) of the Act gives the court discretion to award the prevailing party, other than the United States, reasonable attorneys' fees as part of the costs. 42 U.S.C. § 1973*l* (e). The legislative history of the 1975 amendments to the Act characterizes the fee awards as essential to the full enforcement of the applicable constitutional requirements and federal statutes. S.Rep.No. 94–295, 94th Cong., 1st Sess. 41, *reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 774, 808.

■ The standards for awarding fees under Section 14(e) are the same as under the fee provisions of the 1964 Civil Rights Act. *Id.* at 807. A successful party "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). The Coalition obviously meets the "prevailing party" requirement for attorneys' fees purposes. It has succeeded on the significant issues in litigation,[5] *i. e.*, whether school districts in Texas are political subdivisions under the Act and are subject to the Section 5 preclearance provisions, and has achieved the benefits sought in bringing suit.[6]

■ The fee award is not recoverable against the State of Texas or the Texas Education Agency ("TEA"), however. The Coalition contends that the State of Texas and the TEA are liable because school districts are agencies of the State and pursu-

---

**4.** *See Matthews v. Leflore County Bd. of Election Comm'rs*, 450 F.Supp. 765, 768 (N.D.Miss. 1978), wherein a state statute which changed voting procedures was submitted to the Attorney General, an objection was interposed, and the statute was declared by the court to be without legal force or effect; *United States v. County Comm'n, Hale County, Ala.*, 425 F.Supp. 433, 436 (S.D.Ala.1976), *aff'd*, 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977), wherein the Assistant Attorney General interposed an objection to Hale County's change in the method of electing County Commissioners, the court declared certain enactments with respect thereto to be of no force or effect, and any elections conducted pursuant to the acts were found unlawful.

**5.** *Panior v. Iberville Parish School Bd.*, 543 F.2d 1117, 1119 (5th Cir. 1976) (quoting the legisla-

tive history of 42 U.S.C. § 1973*l* (e) at [1975] U.S.Code Cong. & Admin.News, pp. 774, 808; *Guajardo v. Estelle*, 432 F.Supp. 1373, 1387 (S.D.Tex.1977), *aff'd in part, rev'd in part on other grounds*, 580 F.2d 748 (5th Cir. 1978).

**6.** The Coalition made four requests in its First Amended Complaint filed on July 13, 1977: the convening of a three-judge court; declaratory relief regarding the validity of the January 15, 1977 election; injunctive relief against any official action of the Defendant Board of Trustees; and the award of reasonable attorneys' fees and costs of suit. The decision of the three-judge court in the *Hereford* case and the present findings and Final Judgment of this Court evidence the favorable outcome of the litigation with respect to the Coalition's objectives in bringing suit.

ant to statutorily authorized procedures, the State and the TEA became responsible for creating the WISD. By analogy to cases wherein courts have interpreted identical language in the legislative history[7] of the Civil Rights Attorney's Fees Awards Act of 1976, *amending* 42 U.S.C. § 1988, a portion of the Senate Report accompanying the 1975 amendments to Section 14(e)[8] apparently would support a finding that the State and the TEA can be held liable for attorneys' fees assessed against WISD,[9] if WISD is closely identified enough with and thoroughly controlled by the State. After thorough analysis of Texas case law, the Court is not persuaded that said relationship exists between WISD and the State. *Cf. Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (in determining whether Eleventh Amendment immunity extended to Board of Education, the Court found that the determination rested, in part, on the status of the entity pursuant to state law). The validity of WISD as a legal entity created pursuant to state law is not subject to challenge. *See Westheimer Independent School District v. Brockette*, 567 S.W.2d 780, 789 (Tex.1978). The Fifth Circuit Court of Appeals acknowledged WISD's status as a validly created school district and vacated that portion of the district court's order enjoining WISD from maintaining its corporate existence. *Ross v. Houston Independent School District*, 583 F.2d 712, 716 (5th Cir. 1978). Accordingly, WISD may be viewed by this Court as being subject to the various rulings concerning independent school districts which have been rendered by Texas state and federal courts.

█ Texas law is clear that school districts in the State are "local public corporations of the same general character as municipal corporations." *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20, 26 (1931) (citation omitted); *accord, Lewis v. Independent School District of City of Austin*, 139 Tex. 83, 161 S.W.2d 450 (1942); *Watts v. Double Oak Independent School District*, 377 S.W.2d 779 (Tex.Civ.App.—Ft. Worth 1964, no writ). By virtue of that status, for example, school districts and their trustees have been cloaked with immunity from negligence in tort actions while they are exercising governmental functions. *See, e. g., Campbell v. Jones*, 264 S.W.2d 425 (Tex. 1954); *Russell v. Edgewood Independent School District*, 406 S.W.2d 249 (Tex.Civ. App.—San Antonio 1966, writ ref'd n. r. e.); *Treadaway v. Whitney Independent School District*, 205 S.W.2d 97 (Tex.Civ.App.—

---

7. S.Rep.No. 94–1011, 94th Cong., 2d Sess. 5, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 5908, 5913.

8. [D]efendants in these cases are frequently state or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either from the official directly, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).
S.Rep.No. 94–295, 94th Cong., 1st Sess. 41, *reprinted in* [1975] U.S.Code Cong. & Admin. News, pp. 774, 808.

9. In the civil rights context, the Supreme Court of the United States has held that the Eleventh Amendment does not bar an award of attorneys' fees against state officials in their official capacities. *Hutto v. Finney*, 437 U.S. 678, 692, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978). In response to an objection to the district court's having directed that the fees be paid out of Department of Correction funds, the *Hutto* Court observed that other directives "compara-

ble in their actual impact on the State" had been approved, and the directive was found not to be reversible error even though omission of any reference to the Department would have been better form. *Id.* at 692–93, 98 S.Ct. at 2575. In the *Hutto* case the defendant state prison officials were represented by the State Attorney General's office from the inception of the litigation. *Id.* at 689, 692 n. 19, 98 S.Ct. at 2573, 2574 n. 19, 693, 699, 699 n. 32, 98 S.Ct. at 2575, 2578 n. 32. The State's lawyers have not represented the instant defendant during any stage of this action.
The Fifth Circuit Court of Appeals also has held that the Eleventh Amendment is not a bar to an award of attorneys' fees against a state, *i. e.*, against state officials in their official capacities, in actions under the statutes enumerated in the Civil Rights Attorney's Fees Awards Act. *See, e. g., Rainey v. Jackson State College*, 591 F.2d 1002, 1003 (5th Cir. 1979); *Morrow v. Dillard*, 580 F.2d 1284, 1298 (5th Cir. 1978); *Rainey v. Jackson State College*, 551 F.2d 672, 675 (5th Cir. 1977).

Waco 1947, no writ). Further, as political subdivisions of the State, school districts are exempt from execution or garnishment proceedings. *See National Surety Corporation v. Friendswood Independent School District*, 433 S.W.2d 690, 694 (Tex.1968).

Although school districts in Texas are subject to direct statutory control by the State legislature, the legislature may delegate and has delegated much of the control of the districts to the local trustees. *See, e. g., University Interscholastic League v. Midwestern University*, 255 S.W.2d 177 (Tex.1953); *Alanreed Independent School District v. McLean Independent School District*, 354 S.W.2d 232 (Tex.Civ.App.—Amarillo 1962, writ ref'd n. r. e.); *Independent School District v. Central Education Agency*, 247 S.W.2d 597 (Tex.Civ.App.—Austin 1952), *aff'd*, 254 S.W.2d 357 (Tex.1953). Moreover, "the tradition of local autonomy in education seems long and powerful in Texas," *Rogers v. Brockette*, 588 F.2d 1057, 1064 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979), and because the State provides for such extensive local control, *see Port Arthur Independent*

*School District v. City of Groves*, 376 S.W.2d 330, 333 (Tex.1964), express limitations exist on the legislature's power statutorily to control school districts. *See, e. g., Port Arthur Independent School District v. City of Groves, supra; Love v. City of Dallas, supra.* The Texas Supreme Court specifically has declined to equate the identities of school districts and the State insofar as property is concerned: "Although our independent school districts are creatures of the state and receive substantial funds for their operation from the state, they are independent political entities and we will not classify their property as state property." *Port Arthur Independent School District v. City of Groves, supra*, at 333. Throughout the case law concerning the status of school districts in Texas, a marked pattern emerges: the same courts that characterize school districts as agencies of the State also decline to establish the close identity between district and State or the thorough control by State over district that would justify holding the State or its agent, the TEA, liable for attorneys' fees awarded against WISD.[10] In the Westheimer cases

10. A discerning analysis of the separate identities of the State of Texas and its school districts can be found in *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979). The Court notes that said analysis was in the context of the Fifth Circuit's ascertaining an independent school district's standing to sue the State of Texas; nevertheless, the Court finds the reasoning of the Fifth Circuit extremely helpful in the context of the instant decision. The Fifth Circuit observed that school districts and the State may represent different constituencies: "The school board and the state represent different political interests with different degrees of influence; a group can be a statewide minority, for example, but a majority in certain localities." *Id.* at 1062. In determining that the Garland Independent School District was sufficiently independent of the State to ensure the adversariness required by Article III of the Constitution, the *Rogers* court outlined in some detail the relationship between school districts and the State:

> Legally, independent school districts in Texas have a variety of powers. They perform "all educational functions not specifically delegated" to the state education agencies. Tex.Educ.Code Ann., tit. 2, § 11.01. They are specifically empowered to make contracts, *id.*, §§ 23.26, 23.28, to levy and

collect taxes, *id.* § 23.27, to obtain property by eminent domain, *id.* § 23.31, and generally "to manage and govern the public free schools of the district," *id.* § 23.26(b). They can sue and be sued. *Id.*, § 23.26(a).

The state can, to be sure, supervise the local boards to some degree. The state education authorities may review local school boards' decisions, Tex.Educ. Code Ann., tit. 2, § 11.13, and the local boards are bound by regulations issued by the state agency, *Bear v. Donna Ind. School Dist.*, 85 S.W.2d 797, 798 (Tex.Civ.App.1935). But local boards are then free to attack the state agency's decisions in court. *See, e. g., Board of Trustees v. Briggs*, 486 S.W.2d 829 (Tex.Civ.App. 1972). Thus it seems clear that local boards have some significant legal rights that the state agency cannot take away.

As a practical matter, too, local school boards seem likely to enjoy a good deal of freedom from state authorities. The members of the local boards are elected by the people of the district, not appointed from above. Tex.Educ.Code Ann., tit. 2, § 23.-10(b). Moreover, the local boards have their own funds. They can levy and collect taxes, *id.* § 23.27, and funds disbursed by the state to the districts become the property of the local board of trustees, which holds them in

the local entity subject to the Section 5 preclearance provisions is the party sued and the Coalition's award is collectible against the Defendant school district itself.

■ The Court of Appeals for the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) set down twelve guidelines to be followed by district courts in awarding attorneys' fees. These standards apply in a Voting Rights Act case. *Fain v. Caddo Parish Police Jury*, 564 F.2d 707, 710 (5th Cir. 1977). The *Johnson* court further specified that any agreement which has been made as to fees is not controlling; the court assessing fees must determine what is reasonable, but in no event may the award be greater than what the litigant was contractually bound to pay. *Johnson v. Georgia Highway Express, Inc., supra*, at 718. The court must determine the reasonableness of the fee pursuant to the following factors:

1. *The time and labor required.* The Plaintiff Coalition's attorneys have submitted a detailed record of the time spent on the case including the dates and nature of the work performed during the time in question. (Motion for Award of Attorneys' Fees, Exhibit B). A total of 632.5 hours was spent by attorneys for the Coalition and their paralegal assistants over a period of approximately three years. (Motion for Award of Attorneys' Fees, Exhibit A). The Plaintiff's attorney has indicated that 105.-25 of the total hours were spent by paralegals. The time spent by paralegals, computed at appropriate paralegal rates, reasonably can constitute part of the time considered in awarding attorneys' fees. *See, e.g., Dietrich Corp. v. King Resources Co.*, 596 F.2d 422 (10th Cir. 1979); *Todd Shipyards v. Director, Office of Workers' Compensation*, 545 F.2d 1176 (9th Cir. 1976); *cf.*

*Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 637 (6th Cir. 1979) ("necessary services performed by attorneys which could reasonably have been performed by less expensive personnel may be compensated at a lower rate, . . . [but] they should not be excluded altogether"); *Johnson v. Georgia Highway Express, Inc., supra*, at 717 (non-legal work may be compensated at a rate lower than legal work regardless of whether the non-legal work is performed by an attorney or by paralegal personnel). Although an attorney's record of time is not a talisman, the *Johnson* case mandates that the hours claimed be given real consideration. *Rainey v. Jackson State College*, 551 F.2d 672, 677 (5th Cir. 1977). Considering the nature of the litigation, the expenditure of time and labor does not appear excessive; in any event the accuracy and adequacy of the affidavits are uncontroverted.

Where more than one attorney is involved in a case, the possibility of duplication of effort must be scrutinized. The record reflects some duplication of Miss Perkins' efforts by Mr. Catron, particularly with regard to his establishing familiarity with the case file and researching the attorneys' fees issues. A ten per cent (10%) downward adjustment in the fees of these attorneys takes these factors into account.

A differentiation of rates based upon the type of labor performed is also in order. *See Johnson v. Georgia Highway Express, Inc., supra*, at 717. The Court distinguishes three categories of the type of work performed: (1) strictly legal activities, which include legal research, writing, and court appearances; (2) legally related activities, which include conferences, telephone calls, and other correspondence; and (3) routine administrative activities, which include travel time, clerical work, and compilation

trust for the district; they cannot be taken away by the state. *Wright v. Houston Ind. School Dist.*, 393 F.Supp. 1149, 1155 (S.D. Tex.1975), *vacated and remanded on other grounds*, 569 F.2d 1383 (5th Cir. 1978); *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20, 26 (1931).
*Id.* at 1065–66 (emphasis in original). Further, the court interpreted two Supreme Court deci-

sions as suggesting that actions of school districts are not to be treated as direct acts of the state itself. *Id.* at 1066, citing *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

of facts and statistics. For purposes of the application of different rates to different types of work, the first category will be referred to as work on the merits of the case; the second category will be called informal communications; and the third category will be referred to as non-legal work.

2. *The novelty and difficulty of the questions.* This was a case of first impression which involved many difficult questions of law arising under 42 U.S.C. §§ 1971 et seq. In addition to the complicated substantive questions, many complex procedural issues had to be dealt with in the litigation.

3. *The skill requisite to perform the legal service properly.* The performance of the Plaintiff's attorneys can be evaluated primarily through the documents on file in the record of the case since relatively few court appearances were made during the protracted course of this litigation. A high degree of legal skill was required to deal with the complex issues in the case and the Coalition's attorneys have demonstrated commendable expertise through the extensive briefs and other work product before the Court.

4. *The preclusion of other employment by the attorney due to acceptance of the case; time limitations imposed by the client or the circumstances.* Although this case did not foreclose any other business for counsel due to conflicts of interest, the time spent on the case over the months appeared to preclude Mr. Pannill and Mrs. McCreary from engaging in other work. Counsel undoubtedly gave this matter high priority, and due to the emergency basis on which some portions of the suit had to be conducted, working on the case required counsel to expedite or delay other work.

5. *The amount involved and the results obtained.* Although no damages were requested or are to be awarded in this case, the Plaintiffs did succeed in enjoining the operation of the WISD Board of Trustees which was elected by unlawful means. This success on the merits preserves important constitutional rights embodied in the Fifteenth Amendment and the Voting Rights Act of 1965, as amended.

6. *The "undesirability" of the case.* Counsel's representation of the Coalition occasionally was received unpleasantly by the community and by clients of the firm. Representation of the Coalition had an adverse economic impact on the firm's practice on at least one occasion, when a client ceased to use the firm after learning of its representation of the Coalition.

7. *The nature and length of the professional relationship with the client.* This standard is not a relevant factor in the determination of fees in this case. The Coalition was formed to oppose the Westheimer elections and its existence will no doubt cease when the litigation has ended.

8. *The customary fee; the experience, reputation, and ability of the attorneys; whether the fee is fixed or contingent; awards in similar cases.* The Plaintiff has been ably served by its attorneys who skillfully met the substantive and procedural challenges presented in this case. Regarding the customary fee for similar work in the community, the Court finds that $100 an hour for work on the merits is a reasonable rate for Mr. Pannill's time. This rate of course will be adjusted downward for informal communications and non-legal work. Mr. Pannill's qualifications, along with those of the other attorneys involved, appear in Exhibit C to the Plaintiff's Motion for Award of Attorneys' Fees. William Pannill, lead attorney for the Coalition, is a 1970 graduate of the University of Texas School of Law. He maintains an active federal practice and is admitted to practice before the United States Supreme Court, in addition to other federal courts.

Jacqueline McCreary is a 1971 graduate of the University of Texas School of Law. The Court finds that $75 an hour is a reasonable and customary fee for her work related to the merits. Miss Perkins is a 1975 graduate of the University of Houston's Bates College of Law. Mr. Catron was graduated from the University of Texas School of Law in 1976. Fees of $50 per hour for these attorneys are reasonable for cases of this nature litigated in this District.

In determining whether the fee was fixed or contingent, the Court is mindful of the directive of the *Johnson* court concerning fee contracts, *Johnson v. Georgia Highway Express, Inc., supra,* at 718, and points out that in the Motion for Award of Attorneys' Fees, a fee of $50 per hour once was characterized as an "amount agreed on". The Court, however, has considered the total discussion pertaining to a fee agreement that is included in the Motion. Accordingly, the Court agrees with the Coalition's attorney that $50 per hour was not an agreed fee, but merely reflected the limitations of the Coalition's financial capability. The Court, therefore, concludes that Mr. Pannill was not working for the Coalition pursuant to any contractual agreement constituting a fixed maximum fee. The special circumstances of this case render the hourly rates explained above reasonable. Such an award serves the congressional purpose of granting fees commensurate with those in other types of equally complex federal litigation. [1971] U.S.Code Cong. & Admin. News at 808. The fee is not to be reduced because the rights involved are nonpecuniary in nature. *Id.* As examples of fee awards in similar cases, the Plaintiff's attorneys cite *Guajardo v. Estelle,* 432 F.Supp. 1373 (S.D.Tex.1977), *modified on other grounds,* 580 F.2d 748 (5th Cir. 1978), the Memorandum Concerning Motions for Costs and Attorneys' Fees, *Ross v. Houston Independent School District* (C.A.No. 10,-444, February 1, 1979), and the June 4, 1979 Order Concerning Assessment of Attorneys' Fees in *Ross v. Houston Independent School District, supra.*

Having considered the above factors, and based both on this Court's experience and familiarity with the fees charged in this legal community, and on the standard provided in *Cruz v. Beto,* 453 F.Supp. 905, 910–11 (S.D.Tex.1977), *aff'd,* 603 F.2d 1178, 1186 (5th Cir. 1979), the Court has arrived at the following hourly rates. Mr. Pannill's time should be valued at $100 per hour for work related to the merits, $85 per hour for informal communications, and $20 per hour for non-legal work. *See Johnson v. Georgia Highway Express, Inc., supra,* at 717: "[The] dollar value [of non-legal work] is not enhanced just because a lawyer does it." *Id.* at 717. Mrs. McCreary should receive an hourly rate of $75 for work related to the merits, $60 for informal communications, and $20 for non-legal work. Miss Perkins' and Mr. Catron's time should be valued at $50 an hour for work on the merits and at $30 an hour for informal communications. Paralegals should be compensated at $20 per hour. The total amount due for the claimed hours computes as follows:

| | Work on merits | Informal Comm. | Non-Legal Work | Less Discount | Total Comp. |
|---|---|---|---|---|---|
| William Pannill | 151.50 x $100 | 145.75 x $85 | 11.5 x $20 | 0 | $27,768.75 |
| Jacqueline McCreary | 100 x $75 | 20.5 x $60 | 6.75 x $20 | 0 | $ 8,865.00 |
| Susan Perkins | 24 x $50 | .5 x $30 | –– | 10% | $ 1,093.50 |
| Gary Catron | 64 x $50 | 2.75 x $30 | –– | 10% | $ 2,954.25 |
| Paralegals | | | 105.25 x $20 | | $ 2,105.00 |
| Expenses | | | | | $ 1,697.71 |
| GRAND TOTAL | | | | | $44,484.21 |

Therefore, it is ORDERED, ADJUDGED and DECREED that the Plaintiff Coalition's Motion for Judgment is hereby GRANTED, that the Plaintiff United States' Motion for Entry of Judgment is hereby GRANTED,[11] and that the Plaintiff

11. In the Defendant's Opposition to Plaintiff's Motion for Judgment the Defendant asserts that there are still sixteen defenses to be ruled upon by a proper court. Two of the defenses advanced are that all of the material fact issues in this case have been decided adversely to the

Coalition's Motion for Award of Attorneys' Fees is hereby GRANTED to the extent. herein expressed.

United States' position in *Ross v. Houston Independent School Dist.*, 583 F.2d 712 (5th Cir. 1978), and in the Coalition's case against WISD, C.A. No. H–77–92, and that relitigation of these issues is barred because of the doctrines of collateral estoppel and *res judicata*. These doctrines do not bar the present litigation. The court in *Ross* made the determination that a permanent injunction against WISD's status as a validly created school district under state law is excessive and must be vacated. 583 F.2d at 716. The question of the application of the Voting Rights Act to the district and its January 15, 1977 election was not addressed. *See Ross v. Houston Independent School Dist.*, 559 F.2d 937, 945 (5th Cir. 1977). The issues in C.A. No. H–77–92 were not decided adversely to the Plaintiff's position and no final judgment was entered in that action. The appeal of Judge Hannay's order denying a temporary retraining order and the convening of a three-judge court was dismissed without prejudice to the Coalition's right to renew its request for a three-judge court at the district court level. Judge Hannay's order was vacated and Chief Judge Brown responded to Judge Noel's request for a three-judge court by consolidating the combined Westheimer cases (C.A. No. H–77–92 and C.A. No. H–77–121) with the *Hereford* cases in the Northern District of Texas. The Westheimer cases are now ripe for the entry of Final Judgment.

The proper court to rule upon any other issues presented by the Defendant's enumerated defenses, which have not already been resolved by the Supreme Court in *Sheffield*, by the three-judge court in *Hereford*, or by this Court, is a three-judge District Court for the District of Columbia. 42 U.S.C. § 1973c; H.R.Rep.No. 439, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Admin.News, pp. 2437, 2458.